## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

IMPACT NETWORK, INC.,
A Michigan corporation,

       Plaintiffs,

                               Case No. 21-12663-SDD-KGA

v                                HON. STEPHANIE DAWKINS
                                DAVIS

ECONOMIC TRANSFORMATION
TECHNOLOGIES CORPORATION,
a Florida corporation, BIODATAI,
INC., a Nevada corporation and
UNIVERSAL TUTOR, INC. a Nevada
corporation,

       Defendants.

---

## DEFENDANTS' MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION AND PURSUANT TO *COLORADO RIVER* ABSTENTION DOCTRINE

Defendants Economic Transformation Technologies Corporation, BioDatAi, Inc., and Universal Tutor, Inc. ("Defendants"), by and through the undersigned attorneys, respectfully move this Court for an order dismissing Plaintiff Impact Network, Inc.'s Complaint pursuant to: (i) Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction; and (ii) application of the *Colorado River* abstention doctrine. Defendants' motion is supported by the brief in support filed contemporaneously with the motion.

Defendants' counsel certify that on January 14, 2022, they communicated in writing with opposing counsel, explaining the nature of the relief sought by this motion and seeking concurrence in the relief sought herein and such concurrence was not given.

Dated:  January 17, 2022

Respectfully submitted,

BARNES & THORNBURG LLP

*/s/ Scott R. Murphy*
Scott R. Murphy (P68015)
Anthony C. Sallah
171 Monroe Ave NW, Suite 1000
Grand Rapids, Michigan 49503
Phone:  (616) 742-3930
Facsimile:  (616) 742-3999
smurphy@btlaw.com
asallah@btlaw.com
*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

IMPACT NETWORK, INC.,
A Michigan corporation,

        Plaintiffs,

                              Case No. 21-12663-SDD-KGA

v                                HON. STEPHANIE DAWKINS
DAVIS

ECONOMIC TRANSFORMATION
TECHNOLOGIES CORPORATION,
a Florida corporation, BIODATAI,
INC., a Nevada corporation and
UNIVERSAL TUTOR, INC. a Nevada
corporation,

        Defendants.

---

## DEFENDANTS' BRIEF IN SUPPORT OF MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION AND PURSUANT TO *COLORADO RIVER* ABSTENTION DOCTRINE

---

Scott R. Murphy (P68015)
Anthony C. Sallah (P84136)
BARNES & THORNBURG LLP
171 Monroe Ave NW, Suite 1000
Grand Rapids, Michigan 49503
Phone:  (616) 742-3930
Facsimile:  (616) 742-3999
smurphy@btlaw.com
asallah@btlaw.com

*Attorneys for Defendants*

# TABLE OF CONTENTS

Table of Authorities .......................................................... **Error! Bookmark not defined.**

STATEMENT OF ISSUES PRESENTED ..................................................... iv

STATEMENT OF MOST CONTROLLING AUTHORITY...................................... v

INTRODUCTION................................................................................................. 1

FACTUAL BACKGROUND................................................................................. 2

LAW AND ARGUMENT ..................................................................................... 12

I.  The Court Does Not Have Personal Jurisdiction Over Defendants. ............... 12

   A.  Plaintiff cannot establish that the Court possesses general jurisdiction. 13

   B.  Plaintiff cannot establish that the Court possesses specific jurisdiction. 14

   C.  Michigan's long-arm statute does not support jurisdiction...................... 18

II.  The Colorado River Abstention Doctrine............................................................. 19

   A.  Plaintiff's federal complaint is the product of gamesmanship................. 21

   B.  The remaining *Colorado River* factors favor abstention............................. 22

CONCLUSION .................................................................................................... 24

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*Beydoun v. Wataniya Restaurants Holding, Q.S.C.*,
    768 F.3d 499 (6th Cir. 2014) ................................................................. 16

*BNSF Ry. Co. v. Tyrrell*,
    137 S. Ct. 1549 (2017) ......................................................................... 13

*Brady v. Burtt*,
    979 F. Supp. 524 (W.D. Mich. 1997) ................................................. 15, 17

*Calphalon Corp. v. Rowlette*,
    228 F.3d 718 (6th Cir. 2000) ................................................................. 17

*Cmty. Tr. Bancorp, Inc. v. Cmty. Tr. Fin. Corp.*,
    692 F.3d 469 (6th Cir. 2012) ................................................................. 15

*Conn v. Zakharov*,
    667 F.3d 705 (6th Cir. 2012) ............................................................. 14, 18

*Daimler AG v. Bauman*,
    571 U.S. 117 (2014) ............................................................................. 13

*Deary v. Great Lakes Acquisition Corp.*,
    Case No. 21-11587, 2021 WL 5234500 (E.D. Mich Nov. 10, 2021) ...................... 20

*Gerber v. Riordan*,
    649 F.3d 514 (6th Cir. 2011) ................................................................. 13

*Grammar, Inc. v. Custom Foam Systems, Ltd.*,
    482 F. Supp. 2d 853 (E.D. Mich. 2007) ................................................. 20

*Int'l Techs. Consultants, Inc. v. Euroglas S.A.*,
    107 F.3d 386 (6th Cir. 1997) ................................................................. 16

*Kerry Steel, Inc. v. Paragon Indus., Inc.*,
    106 F.3d 147 (6th Cir. 1997) ................................................................. 15

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
    460 U.S. 1 (1983) ................................................................................. 23

*PaineWebber, Inc. v. Cohen,*
    276 F.3d 197 (6th Cir. 2001) ....................................................................... 23

*Pilipovic v. Driver,*
    No. 19-12033, 2019 WL 4511678 (E.D. Mich. Sept. 19, 2019) ................................ 14

*Preston v. Eriksen,*
    106 F.3d 401 (6th Cir. 1997), 1997 WL 14418.................................................. 20

*Rann v. McInnis,*
    789 F.2d 374 (6th Cir. 1986) ....................................................................... 18

*Rice v. Karsch,*
    154 F. App'x 454 (6th Cir. 2005) ................................................................. 14

*Robinson v. Wheeling & Lake Erie Ry. Co.,*
    No. 1:09-CV-143, 2009 WL 3152969 (W.D. Mich. Sept. 28, 2009)......................... 19

*Romine v. Compuserve Corp.,*
    160 F.3d 337 (6th Cir.1998)......................................................... 19, 20, 21, 22

*SRS Techs., LLC,* 2018 WL 925847 ....................................................................... 18

*Telecast, Inc. v. Pac. Cablevision,*
    731 F. Supp. 1319 (E.D. Mich. 1990)......................................................... 16

*Theunissen v. Matthews,*
    935 F.2d 1454 (6th Cir. 1991) ....................................................... 12, 13, 17

**Statutes**

MCL § 600.711................................................................................................ 13

MCL § 600.711(1)-(3)....................................................................................... 13

MCL § 600.715................................................................................................ 18, 19

MCL § 600.715................................................................................................ 19

## STATEMENT OF ISSUES PRESENTED

1.      Whether this Court should dismiss Plaintiff's Complaint under Federal Rules of Civil Procedure 12(b)(2) and 12(b)(3) for lack of personal jurisdiction and improper venue?

Defendants' Answer:  Yes.

2.      Whether this Court should dismiss Plaintiff's Complaint under the *Colorado River* abstention doctrine?

Defendants' Answer:  Yes.

## STATEMENT OF MOST CONTROLLING AUTHORITY

1. Federal Rules of Civil Procedure 12(b)(2) and 12(b)(3)

2. *BNSF Ry. Co. v. Tyrrell*, 137 S. Ct. 1549 (2017)

3. *Daimler AG v. Bauman*, 571 U.S. 117 (2014)

4. *Int'l Techs. Consultants, Inc. v. Euroglas S.A.*, 107 F.3d 386 (6th Cir. 1997)

5. *Calphalon Corp. v. Rowlette*, 228 F.3d 718 (6th Cir. 2000)

6. *Audi AG & Volkswagen of Am., Inc. v. Izumi*, 204 F. Supp. 2d 1014 (E.D. Mich. 2002)

7. *Zide Sport Shop of Ohio, Inc. v. Ed To-bergte Assoc., Inc.* 16 Fed.Appx. 433, 437 (6th Cir. 2001)

8. *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 817 (1976)

9. *Romine v. Compuserve Corp.*, 160 F.3d 337 (6th Cir.1998)

## INTRODUCTION

Defendants' Motion to Dismiss for Lack of Personal Jurisdiction should be granted. As a preliminary matter, it is important to note that Defendants filed a lawsuit in Texas state court (the "Texas Action") over the same contracts and involving the same parties at issue in this proceeding on August 8, 2020 – four months prior to the initiation of this proceeding.

The facts clearly and undisputedly show that Defendants are not subject to personal jurisdiction as Defendants do not have substantial minimum contacts with Michigan, and the exercise of jurisdiction by this Court would not comport with the relevant constitutional requirements. Defendants did not travel to Michigan related to the contracts at issue, are not residents of Michigan, have no employees in Michigan, own no property in Michigan, have no registered agent in Michigan, and did not purposely avail themselves of the benefits of Michigan law. Defendants' contacts with Michigan are merely random and fortuitous. Instead, the letter agreement and contracts in this case were from Plaintiff and addressed to Defendants' physical address in Texas, not Michigan, and the Plaintiff stood to gain financially from the transactions with Texas residents and Defendants' performance in Texas. Under these facts, Defendants' Motion to Dismiss for Lack of Personal Jurisdiction should be granted.[1]

Defendants further submit that this action should be dismissed under the

---

[1] Defendants attach the affidavits of Brittany Burtz and Kelly Cook in support of this motion.

*Colorado River* abstention doctrine.  Defendants previously filed Texas Action against Plaintiff on August 3, 2021 in Collin County Texas, Cause No. 471-04215-2021, asserting claims for breach of contract and fraudulent inducement. In that lawsuit, Plaintiff filed a special appearance contesting personal jurisdiction and set a hearing for December 17, 2021.  On November 15, 2021, Plaintiff filed this action seeking to enforce the very same contracts at issue in the Texas Action.  As the December 17, 2021 hearing approached, Defendants submitted extensive briefing with supporting affidavits establishing personal jurisdiction over Plaintiff.   In response, Plaintiff withdrew its notice of hearing the day prior to the hearing and rescheduled it for February 8, 2022.  As set forth in further detail below, Plaintiff filed this action as a "defensive tactical maneuver" to avoid litigating this matter in Texas state court. Under the *Colorado River* abstention doctrine, this matter should be dismissed and/or stayed pending resolution of the Texas Action.  Otherwise, the parties will be forced to engage in piecemeal litigation as a result of Plaintiff's gamesmanship.

## FACTUAL BACKGROUND

As detailed in the Burtz affidavit, Economic Transformation Technologies Corporation ("ETT") is the parent company of both Universal Tutor, Inc. ("UT") and BioDatAi, Inc. ("BAI").  Defendants maintain their principal places of business in Collin County, Texas and are residents of Texas.  Defendants are not residents of Michigan.  Brittany Burtz, President of ETT and CEO of UT, was involved in the negotiations, execution, and performance of the contracts between Plaintiff, ETT, UT,

and BAI, dated January 22, 2021 (the "Contracts").  Plaintiff is a Michigan company with its principal offices in Detroit, Michigan.  Ms. Burtz personally participated in numerous Zoom meetings, conference calls, email communications, and an in-person meeting (Florida) with officers and representatives of Plaintiff regarding the Contracts and the terms contained therein.[2]

On or around August 2020, Stephen Adler ("Adler"), who was engaged by ETT as a consultant, introduced ETT, UT, and BAI ("Defendants") to Plaintiff for the purposes of discussing a business relationship with Plaintiff.  The initial concept was to enable Defendants to market their digital technologies to Plaintiff's customers and members, and in turn, share revenues generated from those efforts with Plaintiff.[3]

With regard to UT, the companies desired to market and drive traffic to UT's online educational platform by marketing to Plaintiff's members and customers.  BAI, who developed an online healthcare platform, also sought to market and promote its products and services to Plaintiff's customers and members.  Both UT and BAI's services were designed to reach those in the community that traditionally lacked reasonable access to education and healthcare services.[4]

To that end, Plaintiff represented to Defendants, during a Zoom meeting in August 2020, that it was the largest black-owned media outlet and reached over 88

---

[2] Burtz Aff. ¶ 2.

[3] *Id.* at ¶ 3.

[4] *Id.* at ¶ 4.

million households that primarily focused on providing media to people of color in the United States, parts of Africa, and the Bahamian Islands.  Ms. Burtz personally participated in that August 2020 Zoom meeting, as did several other representatives of Defendants, at Defendants' offices in Frisco, Texas.  Those attending the Zoom meeting on behalf of Plaintiff were fully aware that Defendants and all Defendants' representatives lived and worked in Texas.[5]

Bishop Wayne Jackson ("Bishop") is the CEO and President of Plaintiff, and his son Royal Jackson ("Royal") is also an officer of Plaintiff.  Both Bishop and Royal were on the August 2020 Zoom meeting and both represented the scope and reach of its media outlet to Defendants being 88 million or more households and being the largest black-owned media outlet in the United States.  These representations were made to Defendants in Texas on the Zoom meeting and were critically important to Defendants' business plans, and Defendants relied that Plaintiff was honestly representing its market scope and reach.  This initial August 2020 Zoom meeting lasted an hour or more, and both Defendants and Plaintiff educated one another about their respective businesses, strategic objectives, and possible partnership and collaboration between the companies. The representations made by Plaintiff during this Zoom meeting to Defendants in Texas form the basis of Defendants' fraud claims in the Texas Action.[6]

A week or so after the initial August 2020 Zoom meeting between the parties

---

[5] *Id.* at ¶ 5.

[6] *Id.* at ¶ 6.

and upon reliance on Plaintiff's representations during that Zoom meeting, the parties negotiated and signed a letter of intent, dated September 2, 2020 (the "LOI"). The LOI was on Plaintiff's letterhead, was addressed to Ms. Burtz, listed her address as Defendants' representative at One Cowboys Way, Frisco, Texas 75034, and was from Bishop, CEO of the Plaintiff, as shown by his signature on the LOI. The LOI was initially drafted by Defendants in Texas with the help and input of the Plaintiff, and the final version was reviewed, edited, and signed by Bishop and sent to Defendants at their Texas offices. A true and correct copy of the LOI is attached to the Burtz affidavit as **Exhibit A**.[7]

In the LOI that was addressed and sent to Ms. Burtz at her offices in Texas, Plaintiff again represented that it was the largest black-owned media outlet in the United States, parts of Africa, and the Bahamian Islands. Plaintiff also represented that it broadcasted to 88 million households. The LOI also states Plaintiff's intention to "collaborate and partner" with UT. This contemplated transaction was substantial, complex, and potentially valuable to both parties as partners in this strategic endeavor to benefit people of color in the United States. The LOI states:

> **We at Impact understand that Universal Tutor's specialization in Social & Emotional Learning (SEL), critical thinking, problem-solving, self-esteem, self-awareness, goal setting, social perceptiveness, and creation of a tailored online learning environment to our black and brown youth will inspire our children to "unleash the lion" letting go of fear and doubt to become future business leaders, serial entrepreneurs, and models of possibilities**

---

[7] *Id.* at ¶ 7.

for success.[8]

As the LOI shows and as stated by the Plaintiff to Defendants in Texas, this business partnership was multi-faceted, complex, and required a great degree of collaboration, planning, due diligence, and candor between the parties. These statements made by the Plaintiff, addressed to Defendants in Texas, form the basis of Defendants' fraud claims in the Texas Action.[9]

At the time of the execution of the LOI, Defendant BAI was not part of the contemplated transaction. After the August Zoom meeting, and representations made to Defendants, and execution of the LOI, and representations made to Defendants in the LOI, Plaintiff discovered that ETT had a healthcare platform, developed by BAI, and believed that BAI and its healthcare offerings should be included in this business relationship with the Plaintiff as the Plaintiff believed that the healthcare offering would be valuable to its members/customers.[10]

After execution of the LOI, the parties began to have numerous calls, Zoom meetings, and other communications in an effort to refine the transaction and business relationship. All Defendants participated in these in-depth conversations. On behalf of the Plaintiff, Bishop, Royal, Terry Arnold, and others participated in these communications with Defendants in Texas. During these calls and Zoom meetings, the

---

[8] *Id.* at ¶ 8.

[9] *Id.* at ¶ 9.

[10] *Id.* at ¶ 10.

Plaintiff continued to represent to Defendants in Texas that it had over 88 million households, members or customers that Plaintiff would market and promote Defendants' services. These representations made to Defendants form the basis of Defendants' fraud claims in the Texas Action. During these times, the parties did not travel due to the Covid-19 pandemic.[11]

On January 22, 2021, and after six months of detailed and complex negotiations, the parties executed the two Contracts at issue in this litigation. True and correct copies of the Contracts are attached as **Exhibits B & C** to the Burtz affidavit.[12]

In the Contracts, the Plaintiff made numerous representations and promises consistent with its representations during negotiations, the LOI, Zoom meetings, and phone calls all made to Defendants while they were at their offices in Texas. Importantly, the Contracts were in the form of letter agreements. The letter agreements were from Bishop, CEO of Plaintiff, and were addressed to Defendants ETT, BAI, and UT at One Cowboys Way, Frisco, Texas 75034. The Contracts were initially drafted by Defendants in Texas with the help of and input by representatives of the Plaintiff and reviewed, edited, and signed by Bishop and sent to Defendants at their Texas offices.[13]

In the Contracts addressed to Defendants in Texas (the Contracts contain almost identical language), Plaintiff made numerous representations and promises that

---

[11] *Id.* at ¶ 11.

[12] *Id.* at ¶ 12.

[13] *Id.* at ¶ 13.

Defendants relied upon when entering into the agreements with Plaintiff, including but not limited to the following:

- **Impact is the fastest growing and largest black-owned faith-based tv network both domestically panning across the United States, the Bahamian Islands, and parts of Africa.**

- **Broadcasting in over 93 million households.**

- **Impact is proud to collaborate and partner with Universal Tutor.**

- **To further Universal Tutor's mission, Impact will provide Universal Tutor with the data points, including but not limited to the names, phone numbers, email addresses and market data for its customers for Universal Tutor to use to market its products.**

- **Impact will, to further Universal Tutor's message and generate revenue, provide celebrities for endorsements and appearances on Universal Tutor's channel.**

- **Universal Tutor, with its parent ETT, will be Impact's exclusive provider of:**
  - **Social and Emotional Learning Programs;**
  - **Online Education; and**
  - **Educational Tools.**

- **Impact would also like to enter into a revenue sharing agreement with Universal Tutor and ETT for revenues generated by Universal Tutor for advertisements from its relationships from Walmart, Apple, Microsoft and Google.**

- **Impact would also share revenues with from [sic] all sales of educational goods and services by Impact on Amazon, Walmart, Apple, Microsoft and Google.**

- **Universal Tutor will wire … $1,000,000 for a non-refundable advertising purchase to be used for a media effort to promote Universal Tutor's channel and educational products on the Impact Plaintiff.[14]**

The Contracts require performance in Texas and the parties anticipated performance in Texas.  Any performance contemplated in Michigan were merely incidental to the primary purposes of the Contracts, which focused substantially on Defendants' performance in Texas.  More specifically, the Plaintiff was to send its customer data, a critical component of the agreements, to Defendants in Texas for Defendants to use in their marketing and promotional efforts in partnership with Plaintiff.  Plaintiff was also obligated to provide celebrity endorsements for use on Defendants' channels that Defendants would control from their offices in Texas.  Additionally, the Plaintiff contemplated sharing revenue created by Universal Tutor in Texas through relationships with Walmart, Apple, Microsoft, and Google.  Further, Plaintiff contemplated sharing revenue with Defendants in Texas for revenue from the sale of educational services by the Plaintiff on Amazon, Walmart, Apple, and Google, and this part of the agreement was the foundation of the Contracts from Defendants' perspective.  Finally, Defendants would also perform the Contracts in Texas relating to payment of the marketing budget to promote its products and the revenue sharing in Texas as detailed above.[15]

---

[14] *Id.* at ¶ 14.

[15] *Id.* at ¶ 15.

After execution of the Contracts, Defendants soon came to learn that most of Plaintiff's promises and representations were not true. After performing additional research and from speaking to representatives of Plaintiff, Defendants learned that Plaintiff did not broadcast to over 93 million households, had no real customers or customer data to share with Defendants in Texas as promised, had no marketing budget or business plan as to how Plaintiff was going to use the marketing funds contemplated by the Contracts, and had no real sense of how to market Defendants' products and services. Indeed, representatives of Plaintiff later told Defendants that they would be lucky to get even 10,000 households.[16]

As detailed in the Cook affidavit, a copy of which is attached as **Exhibit B**, Kelly Cook is the CEO of both ETT and BAI. After execution of the Contracts, Mr. Cook began to work closely with the Plaintiff during and after execution of the Contracts. Mr. Cook was focused on marketing, business, and partnership plans to allow the Defendants to implement the terms and expectations under the Contracts. As part of that process, Mr. Cook put together a detailed questionnaire, along with Greg Carson of ETT, to gather critical data from Plaintiff to allow implementation of the parties' agreements. The questionnaire covered both healthcare (BAI) and education (UT) issues as well as seeking to understand Plaintiff's customers/members, including demographics, interests, and other related market data. Plaintiff never responded to

---

[16] *Id.* at ¶ 16.

any of his questions or other questions from Defendants, which caused grave concerns about Plaintiff's honesty during negotiations and representations made in the Contracts, including Plaintiff's ability to perform as promised.  During conversations with Terry Arnold, representative of Plaintiff, and Steve Marconi, an engaged marketing partner of Plaintiff, they conveyed to Defendants information about their lack of market reach and customers/members that were totally inconsistent with representations in the Contracts and negotiations.[17]

Also, as part of the Contracts, Defendants were to make two separate payments of $1,000,000 each for UT and BAI to fund Plaintiff's marketing plan to promote Defendants' products and services.  After asking several times for this information, no marketing or business plan was ever established or disclosed that would show how Plaintiff would use Defendants' $2,000,000, and it appeared that Plaintiff had no plan at all as to how to perform its obligations under the Contracts.  At one point, Mr. Cook even prepared a form business plan for Plaintiff, and all the Plaintiff had to do was simply fill in the blanks and answer a few questions.  Even after doing the work for Plaintiff, it never responded or provided the information.  It was then clear that Plaintiff either never intended to perform as promised or simply had no idea what it was doing. Either way, it breached its promises and misrepresented numerous issues, as detailed herein, to Defendants.[18]

---

[17] Cook Aff. at ¶ 8.

[18] *Id.* at ¶ 9.

Defendants also inquired about the number of customers/members as Plaintiff was obligated to provide data on those members, to Defendants in Texas, to allow Defendants to market and promote their products.  It appeared that Plaintiff did not have actual customer or member data as represented.[19]

Plaintiff's purported market reach in the United States was also a material part of the transactions for Defendants.  According to Plaintiff, its market reach included Texas as Plaintiff broadcasted to residents in Texas – a material consideration for Defendants.  Texas is a large market, and it was important to Defendants that Plaintiff could also reach Texas residents. Because of these material misrepresentations and breaches of the Contracts, Defendants brought the Texas Action.  Defendants' causes of action for breach of contracts and fraud all related to the representations, promises, and agreements detailed herein, which were focused primarily in Texas – not Michigan.[20]

## LAW AND ARGUMENT

### I.     The Court Does Not Have Personal Jurisdiction Over Defendants.

Rule 12(b)(2) permits the Court to dismiss an action for lack of personal jurisdiction. Fed. R. Civ. P. 12(b)(2). It is Plaintiff's burden to establish personal jurisdiction through "specific facts showing that the court has jurisdiction." *Theunissen v. Matthews*, 935 F.2d 1454, 1458 (6th Cir. 1991). If the Court does not conduct an

---

[19] *Id.* at ¶ 10.

[20] *Id.* at ¶ 11.

evidentiary hearing and relies on affidavits alone, Plaintiff must make at least a *prima facie* showing of personal jurisdiction to defeat dismissal. *Id.* at 1458.

Personal jurisdiction can either be general or specific. *Gerber v. Riordan*, 649 F.3d 514, 517 (6th Cir. 2011). General jurisdiction is proper only where "a defendant's contacts with the forum state are of such a continuous and systematic nature that the state may exercise personal jurisdiction over the defendant even if the action is unrelated to the defendant's contacts with the state." *Id.* (citation omitted). Specific jurisdiction arises out of the defendant's contacts with the forum. *Id.* In a diversity action, personal jurisdiction must be supported both by constitutional due process requirements and the state's long-arm statute. *Id.* (citing *Calphalon Corp. v. Rowlette*, 228 F.3d 718, 721 (6th Cir. 2000).

### A.   Plaintiff cannot establish that the Court possesses general jurisdiction.

Michigan's long-arm statute for corporations, MCL § 600.711, requires one of three specified relationships for general jurisdiction: incorporation under Michigan law, consent to be sued in Michigan, or the carrying on of "continuous and systematic part of its general business" within Michigan. MCL § 600.711(1)-(3). A corporation's "paradigm" forums in which it is "at home" are its place of incorporation and principal place of business. *BNSF Ry. Co. v. Tyrrell*, 137 S. Ct. 1549, 1552 (2017). Only in exceptional circumstances, where the corporation's affiliations are "so constant and pervasive," will a corporation be at home outside of its paradigm forums. *Daimler AG*

*v. Bauman*, 571 U.S. 117, 122 (2014).

Here, there is no basis for asserting general jurisdiction over Defendants. Defendants are not Michigan companies. They have no employees, mailing addresses, property, or business operations in Michigan. Accordingly, Plaintiff cannot establish that general jurisdiction is proper as a matter of law. *Pilipovic v. Driver*, No. 19-12033, 2019 WL 4511678, at *1 (E.D. Mich. Sept. 19, 2019) (noting that even "conducting business in a state does not suffice for purposes of general jurisdiction.") (citing *Daimler*, 570 U.S. at 123, 137-39).

Finally, Defendants have not consented to be sued in Michigan. The Contracts do not contain jurisdictional or choice of law provisions.  Accordingly, there is no basis for general jurisdiction.

## B.    Plaintiff cannot establish that the Court possesses specific jurisdiction.

Because there is no general jurisdiction, Plaintiff must prove that (1) there are sufficient minimum contacts between Defendants and Michigan, and (2) the claim for which jurisdiction is necessary arises out of those minimum contacts. *Conn v. Zakharov*, 667 F.3d 705, 712 (6th Cir. 2012). Plaintiff must establish "with reasonable particularity sufficient minimum contacts with [Michigan] so that the exercise of jurisdiction over [Defendants] 'would not offend traditional notions of fair play and substantial justice.'" *Rice v. Karsch*, 154 F. App'x 454, 459 (6th Cir. 2005) (citation omitted). The Sixth Circuit

14

requires three elements to establish specific jurisdiction:

> First, the defendant must purposefully avail himself of the privilege of
> acting in the forum state or causing a consequence in the forum state.
> Second, the cause of action must arise from the defendant's activities
> there. Finally, the acts of the defendant or consequences caused by the
> defendant must have a substantial enough connection with the forum
> state to make the exercise of jurisdiction over the defendant reasonable.

*Cmty. Tr. Bancorp, Inc. v. Cmty. Tr. Fin. Corp.*, 692 F.3d 469, 471 (6th Cir. 2012) (citation

omitted). An analysis of each of these elements demonstrates that this Court does not

have personal jurisdiction over Defendants.

As to purposeful availment, Defendants did not travel to Michigan for any

purpose relating to the Contracts. Instead, Plaintiff addressed the LOI and Contracts

to Defendants in Texas.  The Contracts were drafted in Texas, and Defendants

physically executed the agreements in Texas, not Michigan. Regardless, "'an individual's

contract with an out-of-state party alone' cannot 'automatically establish minimum

contacts.'" *Kerry Steel, Inc. v. Paragon Indus., Inc.*, 106 F.3d 147, 151 (6th Cir. 1997) (citation

omitted); *Brady v. Burtt*, 979 F. Supp. 524, 526 n.2 (W.D. Mich. 1997) (finding that the

existence of an employment agreement was insufficient to confer personal jurisdiction

because "entering into a contract, without more, does not confer personal jurisdiction

over a party.").

The same rationale applies here. The genesis of the parties' relationship is that

Plaintiff sought to leverage Defendants' products and services – all developed, used,

and controlled by Defendants in Texas – for the financial benefit of Plaintiff.

Defendants' only connection to Michigan is that they contracted with Plaintiff and agreed to send payment to Plaintiff, a Michigan corporation.  By contrast, Defendants entered into the contracts based on Plaintiff's promise to provide marketing data of its members/customers to Defendants in Texas. *Telecast, Inc. v. Pac. Cablevision*, 731 F. Supp. 1319, 1323, n.2 (E.D. Mich. 1990) (declining personal jurisdiction involving asset purchase agreement because "the activities 'in Michigan' which gave rise to the creation of the contract, were minimal and because the contract envisioned no significant continuing relationship with Michigan."). Defendants were not "attempting to exploit any market for its products in Michigan," and Defendants "would have been pleased to communicate with [Plaintiff] wherever the latter wished." *Int'l Techs. Consultants, Inc. v. Euroglas S.A.*, 107 F.3d 386, 395 (6th Cir. 1997) ("[I]t was purely fortuitous that [plaintiff] happened to have a Michigan address. It was equally fortuitous that Michigan was the place where [defendant] visited [plaintiff].").

As to the second factor, Defendants' alleged breach does not arise from Defendants' actions in Michigan. *Beydoun v. Wataniya Restaurants Holding, Q.S.C.*, 768 F.3d 499, 507-08 (6th Cir. 2014) (holding that the "arising from" element requires more than "but-for causation," and instead the "operative facts" of the controversy must be related to the defendant's contact with the state). Here, Plaintiff alleges that Defendants breached the contracts by failing to pay Plaintiff as agreed (Dkt. No. 1, pp. 20-50.) Defendants, however, physically executed the agreements in Texas, where they reside. None of Plaintiff's alleged facts arise from Michigan contacts. *Beydoun*, 768 F.3d at 508

16

("Plaintiffs' alleged causes of action all occurred in Qatar, years after [defendant] recruited [plaintiff] in Michigan."); *Calphalon Corp.*, 228 F.3d at 724 ("[Defendant's] performance of the terms of the agreement and any earning of commissions occurred in the states of [Defendant's] sales territory, not Ohio.").

Defendants' alleged breach did not occur in Michigan, and the Contracts were not drafted, negotiated, or executed in Michigan. Defendants did not travel to Michigan, and regardless "contract negotiations entailing telephone calls and mailings to the forum state, if random, fortuitous, and attenuated, are an insufficient basis for exercising personal jurisdiction over a defendant." *Brady*, 979 F.Supp. at 529-30 (rejecting argument that defendant was subject to personal jurisdiction where it allegedly engaged in "fraudulent negotiations of" a stock purchase agreement).  Moreover, none of the alleged facts that Defendants breached the Contracts arose from conduct in Michigan.

Lastly, the exercise of jurisdiction is not reasonable here. *Theunissen*, 935 F.2d at 1461 (noting that the substantial connection element requires the court to analyze the burden on the defendant, the interest of the forum state, the plaintiff's interest in obtaining relief, and other states' interest in securing the most efficient resolution). Defendants are not residents of Michigan. Litigating this case in Michigan would be an extreme burden for Defendants.  Many of the relevant witnesses would be located out of state. For example, all of Defendants' officers and employees live and work in

Texas.[21] Defendants are not working on any projects in Michigan nor do they have any Michigan business relationships,[22] and Plaintiff has not alleged any sufficient nexus between Defendants and Michigan. (*Id.* at ¶14.) Additionally, and as detailed above, the vast majority of the contemplated performance under the Contracts was to occur in Texas – not Michigan. (*Id.* at ¶¶14-18.); *SRS Techs., LLC*, 2018 WL 925847, at *5 ("Michigan's interest in this litigation is tenuous because ultimately the contract was for goods and services to be delivered to Georgia."). Lastly, Plaintiff has broadcasting agreements relating to Texas and broadcasts to Texas residents.[23]

### C.    Michigan's long-arm statute does not support jurisdiction.

Because Plaintiff cannot satisfy jurisdiction under the Due Process Clause, "it is unnecessary to analyze jurisdiction under the state long-arm statute." *Conn*, 667 F.3d at 712 (citation omitted). Regardless, Plaintiff cannot satisfy Michigan's long-arm statutes, Mich. Comp. Laws §§ 600.715 and 600.705.[24] Specific jurisdiction is established over corporations and individuals if the genesis of the suit arises out of an act(s) that creates, as relevant here, one of the following relationships:

(1) The transaction of any business within the state.
(2) The doing or causing an act to be done, or consequences to occur, in the state resulting in an action for tort.

---

[21] Burtz Aff. at ¶ 2.

[22] *Id.*

[23] *Id.* at ¶ 16.

[24] Michigan's long-arm statute "stop[s] short of the outermost boundaries" of personal jurisdiction permitted by the due process clause of the Fourteenth Amendment to the United States Constitution. *Rann v. McInnis*, 789 F.2d 374, 377 (6th Cir. 1986).

MCL §§ 600.715, 600.705.[25] Plaintiff cannot satisfy these standards. Defendants' performance under the Contracts, and alleged breach, arises out of conduct that occurred outside Michigan. *Robinson v. Wheeling & Lake Erie Ry. Co.*, No. 1:09-CV-143, 2009 WL 3152969, at *6 (W.D. Mich. Sept. 28, 2009) ("The claim, however, must 'arise from' the defendant's conduct of business in the state."). Moreover, as stated above, Defendants did not execute the Contracts in Michigan. Instead, Plaintiff addressed and sent the agreements from Michigan to Defendants in Texas. Also, the Contracts were drafted and executed in Texas.[26]

Accordingly, the Court should dismiss this action for lack of personal jurisdiction.

## II.     The Colorado River Abstention Doctrine.

In *Colorado River Water Conservation Dist. v. United States*, the Supreme Court noted that despite the "virtually unflagging obligation of the federal courts to exercise the jurisdiction given them . . .  regard for federal-state relations" and regard for "conservation of judicial resources and comprehensive disposition of litigation" warrant federal-court abstention from jurisdiction in certain cases. 424 U.S. 800, 817 (1976).  This is one of those cases.

The first step to determine whether abstention is warranted looks at whether the two proceedings are parallel.  *Romine v. Compuserve Corp.*, 160 F.3d 337 (6th Cir.1998).

---

[25] Numbers three, four, five, six, and seven of MCL § 600.715 and 600.705 can be discarded outright.

[26] Burtz Aff. at ¶ 13.

Exact "parallelism is not required; it is enough if the two proceedings are substantially similar." *Id.* at 340. Suits are parallel if "substantially the same parties are litigating substantially the same issues simultaneously in two fora." *Grammar, Inc. v. Custom Foam Systems, Ltd.*, 482 F. Supp. 2d 853, 857 (E.D. Mich. 2007). In this case, the Texas Action and this action are not only parallel, they are virtually identical.  Both cases involve identical parties fighting over identical contracts.

If the two suits are parallel, as they are here, the Sixth Circuit has identified eight factors this Court must consider in "deciding whether to defer to the concurrent jurisdiction of a state court," including: (1) whether the state court has assumed jurisdiction over any res or property; (2) whether the federal forum is less convenient to the parties; (3) avoidance of piecemeal litigation; (4) the order in which jurisdiction was obtained. (5) whether the source of governing law is state or federal, (6) the adequacy of the state court action to protect the federal plaintiff's rights (7) the relative progress of the state and federal proceedings; and (8) the presence or absence of concurrent jurisdiction *Romine*, 160 F.3d at 340–41. In applying these factors, a federal court should "not rest on a mechanical checklist, but on a careful balancing of the important factors as they apply in a given case." *Deary v. Great Lakes Acquisition Corp.,* Case No. 21-11587*, 2021 WL 5234500 (E.D. Mich Nov. 10, 2021) *quoting Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 16 (1983).  Lastly, another factor warranting abstention is whether the plaintiff is engaging in defensive tactical maneuvers to forum shop. *Preston v. Eriksen,* 106 F.3d 401 (6th Cir. 1997) (table), 1997

WL 14418, at *4 n.3. As set forth below, the *Colorado River* abstention doctrine should apply in this case as nearly all the factors support abstention in favor of the Texas Action.

### A.    Plaintiff's federal complaint is the product of gamesmanship.

Plaintiff's creation of piecemeal litigation with its federal complaint is the product of gamesmanship and forum shopping. The most "paramount" factor in the *Colorado River* test is the danger of piecemeal litigation, the third factor considered by the Supreme Court. *Romine*, 160 F.3d at 341. As the Sixth Circuit explained, in evaluating this factor, the "legitimacy of the court system in the eyes of the public and fairness to the individual litigants [is] endangered by duplicative suits that are the product of gamesmanship or that result in conflicting adjudications." *Romine*, 160 F.3d at 341 (emphasis added). Here, there is no question that the federal lawsuit is driven by gamesmanship to shop for a better forum. In the Texas Action, Plaintiff waited until the day before the December 17th 2021 hearing on personal jurisdiction to withdraw the hearing date and reschedule it for February 8, 2022. Meanwhile, Plaintiff filed its doppelganger complaint in this Court to address the very same issues raised by Defendants in Texas state court. Plaintiff's gamesmanship will cause the parties to engage in piecemeal litigation, the most significant factor considered under the *Colorado River* abstention doctrine. This factors alone merits dismissal of Plaintiff's complaint.

### B.     The remaining *Colorado River* factors favor abstention.

The first factor – whether the Texas state court has assumed jurisdiction over any res or property – is not applicable in this case.  The second factor – convenience of the federal forum – weighs heavily in favor of abstention.  This factor focuses solely on "geographical considerations," and in this instance, the two courthouses are approximately 1200 miles apart.  Defendants are all located in Texas as is their counsel.  To require Defendants to litigate this case in Michigan would cause them great inconvenience.  *Compare Colorado River*, 424 U.S. at 820 (concluding that the 300-mile distance between the District Court and the state court is a factor supporting abstention), *with Romine*, 160 F.3d at 341 (concluding that two courthouses in Columbus, Ohio were equally convenient, which "counsels against abstention").

The fourth factor, the order in which jurisdiction was obtained, also weighs in favor of abstention.  The Texas Action was filed in August 2021, over five months ago.  While Plaintiff successfully postponed the hearing on personal jurisdiction until February 8, 2022, that issue should be resolved well in advance of any decision in this matter.  In other words, the state court action has progressed well beyond the federal action.  This factor also favors abstention.   The fifth and sixth factors, the source of governing law and whether state court will adequately protect the parties' rights, also favor abstention.  Plaintiff's federal complaint and the Texas state court action are premised on common law claims for breach of contract, fraud and promissory estoppel.  Such claims are governed by state law, not federal.   As the Supreme Court has

recognized, the "presence in the suit of extensive rights governed by state law" supports dismissal. *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 16 (1983). In this case, Plaintiff has not raised any federal claims and relies upon diversity jurisdiction to bring this action in federal court. As such, the "parallel state-court litigation will be an adequate vehicle for the complete and prompt resolution of the issues between the parties." *Moses H. Cone Memorial Hosp.*, 460 U.S. at 28; *see also PaineWebber, Inc. v. Cohen*, 276 F.3d 197, 208 (6th Cir. 2001). Here, even assuming Plaintiff's "substantive" claims were filed in good faith rather than as a ploy to forum shop, Plaintiff is free to assert counterclaims against Defendants, as a matter of right, in the pending Texas state court action.

The remaining factors, where applicable, further support abstention or do not outweigh the factors cited above. The seventh factor – the relative progress of the state and federal proceedings – is similar to the fourth factor and tips in favor of abstention. The final factor, the presence or absence of concurrent jurisdiction, also favors abstention because neither party has asserted any federal claims.

In viewing the factors above, most notably the threat of piecemeal litigation and Plaintiff's blatant forum shopping, this Court should abstain from exercising jurisdiction and dismiss the case (or, at least, stay and administratively close it.)

## CONCLUSION

For the foregoing reasons, this Court should grant Defendants' Motion and dismiss this case and allow the parties to litigate this matter in the previously filed Texas Action.

Dated:  January 17, 2022

Respectfully submitted,

BARNES & THORNBURG LLP

/s/ Scott R. Murphy
Scott R. Murphy (P68015)
Anthony C. Sallah
171 Monroe Ave NW, Suite 1000
Grand Rapids, Michigan 49503
Phone:  (616) 742-3930
Facsimile:  (616) 742-3999
smurphy@btlaw.com
asallah@btlaw.com
*Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 17, 2022 a copy of the foregoing pleading was filed electronically and served by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.

Dated:  January 17, 2022

Respectfully submitted,

BARNES & THORNBURG LLP

*/s/ Scott R. Murphy*
Scott R. Murphy (P68015)
Anthony C. Sallah
171 Monroe Ave NW, Suite 1000
Grand Rapids, Michigan 49503
Phone:  (616) 742-3930
Facsimile:  (616) 742-3999
smurphy@btlaw.com
asallah@btlaw.com
*Attorneys for Defendants*